Final case for argument is 17-2121 United Therapeutics v. SteadyMed. The Board erred in anticipation with respect to Claim 2 because it never addressed differences in the impurity profile of the product. The Farrow's reference never showed whether Steps A and B were actually performed with respect to that product. So there's no way to know, even if you... You're not appealing the PTAB's invalidation of 1, 3-5, 7-9, 11-14, or 16-20, right? That's correct, Joan. Okay. So are you talking about Claim 2 now? I'm talking about Claim 2, and even if the Board was correct in finding that it had at least 99.5% purity, there's no way to know if the remaining impurities necessarily would have been the same as the product produced by Steps A, B, and C as our claim recited. The Farrow's reference in that working example does not disclose what the origin is of the troposomal on which it performed Step C. The Board never really addressed this point in their holding. In addition to that... Let me ask you about the testimony of Dr. Williams, which the PTAB found was unpersuasive. And in fact, Dr. Williams conceded that he knew of no literature supporting one of his contentions, which is at 1744 and 45. Yet you rely extensively on his testimony in an attempt to undermine the evidence relied on by the PTAB. Now look, you know perfectly well our standard of review on factual determinations. Why should we consider his testimony when the PTAB found it to be unpersuasive? And there's record evidence that shows he's contradictory. Well, I think that Dr. Williams' evidence was based on certificates of analysis that were all submitted to the FDA as part of the FDA's review that ultimately determined that this product had a higher average purity. And Dr. Ruffalo, whose unrebutted testimony established the procedures by which the FDA reviewed all that, shows the validity of the determination. Now, the Board quibbled with particular aspects of Dr. Williams' testimony and the fact that there were certain... Well, that's an interesting word. I mean, there was clear contradiction in his testimony. And, I mean, I'll take you to where, in the record, where he concedes that he doesn't know of any support for what he's saying. Your Honor, I think... I don't know that that's quibbling. Dr. Williams' testimony was that the average purity of the products of the 393 claims was higher as a result of these many, many certificates of analysis, all of which were required to be submitted to FDA. The Board never disagreed with the FDA's ultimate determination that the mean purity was higher for the products of the 393 claim. Now, putting aside this evidentiary question, with respect to claim construction, the 393 specification clearly states that the impurities from steps A and B are reduced as a result of step C. It makes that statement unequivocally with respect to the claimed products as a whole. It's not some preferred embodiment. And despite this unequivocal statement and the fact that it was further argued during the prosecution history with the Walsh Declaration, the Board would not agree that the claims could be construed to require the unique impurity profile. So on claim construction, there's a separate reason to overturn the Board's decision as to claim two. And the Board erred here the same way that it did in In re Smith International by taking a broadest possible interpretation. It wasn't consistent with what is stated in the specification. Where in the record did you request PTAB to construe the term product ellipsis prepared by a process comprising steps A to C and optionally D? So in the patent owner response at 380, appendix 380, there's discussion of claim construction. It's also in our reply brief at pages 14 to 16. But that's a discussion of the fact that the impurity profile is connected to steps A through C of the product by process claim. So there was a separate discussion of the word product, but there was also a discussion of claim construction in the patent owner response as the claims were the steps A through C requiring this impurity profile. So I think you have to look at that as a whole product made by a process comprising steps A through C. The Board relied on the plain meaning of the word product and turned incorrectly to extrinsic evidence to make that determination without regard to what was in the specification or the file history. So I take that as a no. Your Honor, the claim construction was addressed in a way that tried to link the claims of process steps A through C to the impurity profile. I think that when you read product, you can't divorce the word product from steps A through C because it is a product by process claim. Now another aspect of the Board decision that I want to point out is with respect to motivation for combining Ferro's and Moriarty together with claim two. In one part of its decision, the Board says that if you combine these references, you necessarily get a product of at least 99.5% purity. But in an earlier part of its final written decision, the Board concluded that if you purification step of Moriarty. But if you do that, then you wouldn't know what the end result would be, what impact it would have on purity. So the Board never resolves this contradiction in its stated motivation for combining the two references together. Also, with respect to claims 6, 10, 15, 21, and 22, which all require step B, the Board introduced two other references here, Kawakami and Ege. I have some real specific questions I'd like to answer. In the blue brief at 18, you discuss two batches of Trapasanoa and their respective purity levels and melting points, citing JA5438. In the red brief at 16, SteadyMed states that on this page, data concerning a batch labeled UTC15-010203 can be found, but there is no data concerning a batch labeled UTC15-01001. So when I go to the gray brief to look for a reply to that, at 4, you discuss the relationship between purity levels and melting points, and you cite me to 100 pages in the record, JA5420 to 5532. Is that 100 and plus page range your response to the inaccurate citation alleged in the red brief? Well, Your Honor, the specific batch number is not the 100 pages, but the point we are trying to make is that the Board relied selectively on certain batches, and if you look at the certificates of analysis, these individual batch records, you see that there are batch-to-batch variations, and in fact, the same is true when you compare purity and melting points in all of these certificates of analysis, and there are some that have a bigger disparity than others, but the error is that the Board relied on individual batches as opposed to looking at the evidence as a whole the way that it was presented in the Williams Declaration. Okay, so take me back to the beginning of your answer when you said the specific batch number is not what? I didn't hear that word, is not. The specific batch number is not represented by those 100 pages. It's one specific batch. Okay. In the blue brief at 28, you say that a posita would have understood, quote, would have understood that a natural product dash, a product that is found in nature dash, should not be conflated with a pharmaceutical manufacturing product that is synthetic in origin. You don't provide any support for that statement. What's your support in the record? I mean, you know, we read these briefs and we scribble notes. Yeah, I think that this was discussing the claim construction with respect to the word product and the fact that the Board, in its final written decision, had relied on products that were natural products, whereas the context of this invention is that it's a pharmaceutical manufacturing product. And that is described in the claim construction section of the patent owner response that was presented in the IPR. When counsel in a patent case says that a person having ordinary skill in the art would understand something, they have to base that on some kind of evidence, don't they? So where's that evidence? I understand what you're driving at, but that's beside the point. I think that this was such a basic issue, the question of a naturally occurring product as opposed to a synthetic product that we treated it as being self-evident when we made the statement in the brief you're on. So it's pure attorney argument, in other words? Well, when you go back and you look at the various dictionaries that are cited for support of the word product, I think there are dictionaries that separate products and articles that use the word product in connection with pharmaceuticals. There's others that use the word product in connection with naturally occurring product. Here the 393 patent is dealing with pharmaceutical products of synthetic origin that have nothing to do with naturally occurring or naturally isolated product. Okay, you're into your rebuttal. Why don't we turn to the other side and we'll retain your rebuttal time. Yes, three minutes. Good morning, your honors. May it please the court. I have two main arguments. First, there's substantial evidence here for the numerous factual findings made by the board regarding the eight questions raised by United Therapeutics in their opening brief. Second is that the claim construction here of the very fundamental patent claim words seen in many claims, the words product and the word comprising, those constructions finding that their ordinary meanings, the meaning of comprising being including but not limited to, and product being defined by the process steps, that was a correct construction finding the ordinary meaning and there's no reason to reverse here. Let me first turn to the substantial evidence challenge here. There's really, I think, three main challenges. One is about the chemical in the Fary's reference. That chemical is identical to the chemical in claim two. And based on the evidence of two professors that were credited by the court, that chemical has at least the same purity as the chemical claimed in claim two. Similarly, once you combine Fary's and Moriarty's, there's no question, all three process steps are in the prior art. It appears in the briefs that they didn't challenge the combination of Moriarty and Fary's on this appeal. And there was no dispute below that all three steps are there. Therefore, since it's the same process, it must be the same product. And finally, on the combination to invalidate claim six, 10, 15, 21, and 22, there was substantial evidence supporting a reason to combine the Fary's and Moriarty pair with the Kawakami and Egea pair. And the board explained, actually gave two reasons for making that combination, not just one. So there were two independent grounds for that. Are there any questions about the substantial evidence? Or I'll go on to claim construction. Nope. Other than I think you're proposing counsel conceded on those claims. I don't know why you need a discussion. Okay. Let me address then the claim construction result, which is not only correct, but I don't think any way it would change the result in this case if the claim construction were changed to my learned friend's proposal of a substance produced from a chemical reaction. All of the prior references are substances produced from chemical reactions. They're all chemical references. In addition, here we have the word product. The next word after that is comprising. Even if we were to somehow interpret product to mean a product having an impurity profile for a representative batch conferred by its process steps, if we were to put all that language in, even if product meant that and somehow incorporated some impurity profile, even though the records show there were no impurity profiles associated with these products, even if all that were true, the word comprising right after, which adds including but not limited to, would allow for other impurities to be included in the claim. So the claim would both include the profile plus other impurities. So it really wouldn't matter even if we went as far as this other pseudo-construction that they haven't really advocated. Are there any questions on claim construction? Are there any further questions on any other issues? Then I'll cede my time and let counsel rebut. Thank you, Your Honors. In the last remaining minutes, I just want to point out that one of the cases cited in StudyMed's brief, the Aventis v. Amino Chemicals case, shows that a purity-related limitation can be construed without a numerical limit. In that case, the court found that it was appropriate to construe a purity-related limitation to mean, quote, largely but not wholly made up of a certain compound. I think that's analogous to what we're asking for with respect to our claim construction. But even if you completely put aside claim construction, I want to come back to Claims 6, 10, 15, 21, and 22, where the board combined the Kawakami and Ege references, and there's really no motivation to put those on top of Moriarty and Ferres. Kawakami relates to forming a salt of a different compound that has easy isomers. Tropostano is not capable of forming easy isomers. In addition to that, Kawakami's composition was already very impure. It was 77.8 percent pure, and it's very different from Moriarty, which was already a highly pure material. Do you disagree with the statement in the red brief that, quote, even Dr. Williams agreed that the impurity profile would be different in each batch of Moriarty? The individual batches do have variations. And Dr. Williams agreed with that. Tiny impurities, yes. The Ege is just a textbook that simply shows that you can convert a salt to an acid, so it clearly doesn't give you a reason to add a step D on top of Ferres and Moriarty. Well, tropostano is a carboxylic acid, yes? Tropostano free acid, yes. It does have a carboxylic acid. But there's really no reason to... Then why doesn't Ege teach step D? It teaches the chemical reaction. That's all. But there's no reason to apply that extra step, given that you already have a highly pure product. That's the contradiction in the reasoning of the board. If Moriarty is already 99.7 percent pure, there's no reason to apply Kawakami and Ege. And there's also no reasonable expectation that forming a salt would make Moriarty even more pure and allow you to eliminate the column chromatography step, the Moriarty roughens, which is what Dr. Williams found to be very surprising. So the motivation just doesn't add up for combining those four roughens. Thank you, Your Honor. Thank you. We thank both sides. The case is submitted. That concludes our proceedings for this morning. All rise. The honorable court is adjourned until tomorrow morning. It's at o'clock a.m.